**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr><td>

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee*,

　　　　v.

NEIL A. VAN DYCK,
　　　　　*Defendant*,

NANCY A. SMITH; WENDY S. JOHNSON,
　　　　*Intervenors-Appellants.*

</td><td>

No. 16-10160

D.C. No. 2:15-cr-00200-GEB-1

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, Jr., District Judge, Presiding

Argued and Submitted May 17, 2017
San Francisco, California

Filed August 10, 2017

Before: Sidney R. Thomas, Chief Judge, Mary H. Murguia, Circuit Judge, and Jon P. McCalla,[*] District Judge.

Opinion by Chief Judge Thomas

---

[*] The Honorable Jon P. McCalla, United States District Judge for the Western District of Tennessee, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed the district court's denial of a motion by two qui tam relators to intervene in a criminal forfeiture action so that they could recover a share of the proceeds.

The relators worked for the criminal defendant, a licensed podiatrist who was convicted of health care fraud and against whom the government issued a personal forfeiture money judgment in the estimated amount of fraudulent claims paid by victim insurers. The relators filed a qui tam action against the criminal defendant pursuant to the False Claims Act.

The panel held that the relators lack standing to intervene in the criminal forfeiture action, as they had no interest in the property when the criminal acts were committed, and they were not qualifying bonafide purchasers for value. The panel rejected the relators' contention that the "alternate remedy" provisions of the False Claims Act permit a relator to intervene in a criminal action for the purpose of asserting a right to the proceeds of that action. The panel also rejected the relators' argument that they have standing to intervene in the criminal action as "partial assignees of the government's claims" under 21 U.S.C. § 853(n). The panel wrote that the relators' sole statutory remedy is to commence a civil action.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not abuse its discretion in denying an evidentiary hearing or in declining to impose sanctions on the government.

## COUNSEL

Jeremy L. Friedman (argued), Law Office of Jeremy L. Friedman, Oakland, California; Tatiana Filippova and Gary B. Callahan, Clayeo C. Arnold APLC, Sacramento, California; for Intervenors-Appellants.

Colleen M. Kennedy (argued), Assistant United States Attorney; Phillip A. Talbert, United States Attorney; United States Attorney's Office, Sacramento, California; for Plaintiff-Appellee.

## OPINION

THOMAS, Chief Judge:

In this appeal, we consider whether a criminal forfeiture action constitutes an "alternate remedy" to a civil qui tam action under the False Claims Act, entitling a relator to intervene in the criminal action and recover a share of the proceeds pursuant to 31 U.S.C. § 3730(c)(5). We hold that it does not, and we affirm the district court's order denying intervention.

I

The criminal defendant, Neil Van Dyck, was a licensed podiatrist who owned and operated his own podiatry practice

until October 2014. Relator Wendy Johnson worked as a medical assistant for Van Dyck from 1986 to 2008, and Relator Nancy Smith worked as a medical assistant and biller from 2006 to 2012.

A

In March 2011, Van Dyck's unusual billings patterns for surgical nail avulsion,[1] skin graft, and ultrasound procedures prompted an investigation by SafeGuard Services, LLC ("SafeGuard"), a Medicare contractor that investigates potential Medicare fraud and refers cases to law enforcement. In April 2011, SafeGuard notified Van Dyck of its investigation and requested that he submit medical records related to his treatment of eight Medicare beneficiaries between March 1, 2010, and February 28, 2011.

Van Dyck submitted some of the requested records, but SafeGuard suspected that the records had been improperly created or altered. Based on its initial investigation, SafeGuard concluded that Van Dyck had committed Medicare fraud in violation of 18 U.S.C. § 24. It referred the matter to the U.S. Department of Health and Human Services Office of the Inspector General ("the Department") in June 2011. SafeGuard continued to assist the Department with the investigation.

SafeGuard sent Van Dyck a supplemental records request in November 2011 to account for the inconsistencies in Van

---

[1] Nail avulsion involves removing the entire toe nail from the nail bed. Because it takes several months for the toe nail to grow back, it is suspect for more than one nail avulsion procedure to be reported for the same patient within the span of a month or two.

Dyck's initial record submission. Shortly thereafter, SafeGuard received a phone call from Relator Smith—she identified herself at the time as "Nancy"—asking for more information on how to fulfill SafeGuard's supplemental records request. Van Dyck submitted some of the requested supplemental records in January 2012. Again, the submitted records appeared to have been improperly altered.

Shortly before receiving Van Dyck's supplemental records, SafeGuard sent Medicare surveys to approximately forty-seven randomly selected Medicare patients whom Van Dyck treated. Twenty-three patients responded to the survey. Although Van Dyck submitted Medicare claims for having performed surgical avulsions on eighteen of the twenty-three patients, the surveys revealed that those eighteen patients had received only routine foot care. Van Dyck began submitting claims for routine foot and nail care only after SafeGuard's initial request for patient records.

On February 9, 2012, the Department received an anonymous complaint that Van Dyck billed Medicare for nail avulsions when his patients received only routine foot and nail care. The caller also stated that the employees performing the routine care were not licensed or trained to provide podiatry services. When those employees confronted Van Dyck about his billing practices, he told them to mind their own business. The anonymous caller was later identified as Relator Smith.

On July 29, 2014, government investigators interviewed Relator Smith to determine her role, if any, in Van Dyck's submission of fraudulent claims. During the interview, Relator Smith explained that, after she sought clarification of the supplemental records request, she printed patient charts

and other documents for Van Dyck. After Van Dyck reviewed and updated the documents, she reprinted them upon Van Dyck's request. Relator Smith also confirmed that the computer system would only mark documents as "updated" if actual changes were made to the documents; merely printing would not trigger an update to the patient's record. In addition, Relator Smith turned over to the government a work computer that Van Dyck gave her in 2006, when he updated the podiatry practice's computer system. The government contends that the computer has little to no evidentiary value since it had not been used in Van Dyck's podiatry practice or otherwise since 2006, before Van Dyck's fraudulent conduct began.

Based on Safeguard's and the Department's investigations, the government sought, under seal, a warrant to search Van Dyck's office. During the execution of the search warrant, Van Dyck confessed to committing the fraud.

The government filed a criminal information on September 28, 2015, charging Van Dyck with one count of health care fraud in violation of 18 U.S.C. § 1347. Van Dyck pled guilty to the charge and agreed to forfeit funds from his retirement account as part of his plea agreement. On October 27, 2015, the district court issued a personal forfeiture money judgment against Van Dyck for $1.23 million, the estimated amount of fraudulent claims paid to Van Dyck by the victim insurers.

B

On July 6, 2012, over a year after SafeGuard began its investigation of Van Dyck, Relators filed under seal a qui tam action against Van Dyck, pursuant to the False Claims Act,

31 U.S.C. § 3730(b).  In their complaint, Relators alleged that, for ten years, Van Dyck submitted fraudulent claims to Medicare, Medicaid, and Medi-Cal "for procedures not performed, for medical material not used, for derma graphs used illegally . . . , [and] for routine foot care not authorized for reimbursement . . . ."  Relators also alleged that Van Dyck falsified patient records to reflect procedures not performed, wrote chart notes to indicate that he saw patients he never saw, and billed as surgical procedures pedicures given to patients he never saw.

Relators' qui tam action remained under seal until late January 2016, as a result of the government's seven requests for six-month seal extensions for the purpose of conducting further investigations. *See* 31 U.S.C. § 3730(b)(3). However, the government did obtain a partial lift on the seal in November 2014 to disclose the qui tam action to Van Dyck. According to Relators' attorney, one of the Assistant U.S. Attorneys handling the qui tam action told him that Van Dyck's defense attorney reported that "Van Dyck wants to resolve everything but recognizes there won't be enough funds to cover all of the loss."  The U.S. Attorney's Office proceeded to further investigate Relators' qui tam claims over the next year and attempted to negotiate a settlement agreement for the False Claims Act allegations in the qui tam suit.  In November 2015, Van Dyck's counsel informed the U.S. Attorney's Office that Van Dyck rejected the government's qui tam settlement offer and refused to continue settlement negotiations.

The government declined to intervene in the civil qui tam action on February 18, 2016.  The qui tam action is currently pending before the district court.

C

Beginning on November 30, 2015, Relators made several unsuccessful attempts to intervene in the government's criminal forfeiture action against Van Dyck. In their final amended motion to intervene, Relators sought an unspecified amount of the funds recovered in the criminal forfeiture action, as well as "reasonable expenses, attorney fees and costs, from all the assets obtained" from Van Dyck.

The district court denied Relators' motion, concluding that Relators failed to demonstrate a recognized interest in the criminal forfeiture proceeding, which is required to intervene under 21 U.S.C. § 853(n). The district court declined Relators' oral request for an evidentiary hearing concerning the propriety of intervention. Finally, the district court declined to consider Relators' request that the district court sanction the government because Relators raised the request for the first time in their reply brief for the motion to intervene.

II

Relators lack standing to intervene in the criminal forfeiture action. Thus, the district court properly denied the intervention motion. As a general rule, individuals lack standing to intervene in criminal prosecutions. *See Linda R. S. v. Richard D. and Texas*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). Further, the specific criminal forfeiture statute at issue, 21 U.S.C. § 853, imposes a general bar on parties intervening in the criminal case. 21 U.S.C. § 853(k). The two exceptions to the general bar are (1) third parties who had a vested interest in the

property at the time of the commission of the acts that gave rise to forfeiture, and (2) bona fide purchasers for value without cause to believe the property was subject to forfeiture. 21 U.S.C. § 853(n)(6). Relators had no interest in the property when the criminal acts were committed, and they were not qualifying bona fide purchasers for value. Therefore, under the general rule and the specific statutory provisions, Relators had no right to intervene in the action.

We have reached similar conclusions in other contexts. For example, in *United States v. Kovall*, 857 F.3d 1060 (9th Cir. 2017), we considered whether a victim could appeal a restitution order under the Criminal Victims Rights Act, and concluded that the third-party victim did not have standing to do so. *Id.* at 1069. In *United States v. Mindel*, 80 F.3d 394 (9th Cir. 1996) we held that the beneficiary of a criminal restitution order made pursuant to the Victim and Witness Protection Act of 1982 did not have standing to appeal a restitution order. *Id.* at 396.

The appellants in *Kovall* and *Mindel* had better standing arguments than Relators do here. As we know, to establish standing, a party must have an "actual or imminent invasion of a legally protected, concrete, and particularized interest," "a causal connection between the injury and the conduct complained of," and the likelihood "that the injury will be redressable by a favorable decision," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Relators have not established a right to a share of the proceedings; rather, they simply assert an unliquidated, undetermined, and speculative interest in the forfeited money. Indeed, the district court concluded, based on the parties' averred evidence, that Relators did not qualify to assert an interest. It noted that the government began investigating Van Dyck for fraud before

Relators filed their qui tam action in July 2012, and that the results of the investigation—rather than Relators' disclosed information—prompted the criminal forfeiture action. It determined that Relators failed to show the import of the information they provided to the government or that the government did not already possess such information. The district court also concluded that Relators failed to demonstrate a recognized interest in the criminal forfeiture proceeding, which is required to intervene under 21 U.S.C. § 853(n).

The district court was entirely correct. Intervention would have violated the general rule against non-parties intervening in criminal proceedings; intervention was not permitted under the governing statute; and Relators did not establish a sufficient interest in the forfeited funds. Relators lack standing to intervene.

III

Relators argue that they should be permitted to intervene in the criminal forfeiture action against Van Dyck "for the limited purpose of adjudicating and obtaining their statutory relators' award from the funds forfeited by a qui tam defendant." They specifically argue that their motion should be granted because (1) the government elected to pursue its claim for recovery through the "alternate remedy" of a criminal forfeiture action rather than through Relators' qui tam action, 31 U.S.C. § 3730(c)(5); and (2) Relators have standing as "partial assignees of the government's claims" to intervene in the criminal forfeiture action, 21 U.S.C. § 853(n).

A

The "alternate remedy" provisions of the False Claims Act do not permit a relator to intervene in a criminal action for the purpose of asserting a right to the proceeds of that action.

The False Claims Act imposes civil liability on any person who knowingly submits to the U.S. government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a). Under the Act, either the Attorney General may file suit to recover lost funds, 31 U.S.C. § 3730(a), or a private citizen—a "relator"—may bring a qui tam suit on behalf of the government, 31 U.S.C. § 3730(b).

When a private citizen files a qui tam complaint under the False Claims Act, it must remain under seal for at least sixty days. 31 U.S.C. § 3730(b)(2). During that time, the government must determine whether it will intervene in the action. 31 U.S.C. § 3730(b)(4). With a showing of good cause, the government may request extensions of the sixty-day period during which the suit remains under seal. 31 U.S.C. § 3730(b)(3).

If the government chooses to intervene in the qui tam action, the relator is entitled to fifteen to twenty-five percent of the proceeds of the action or settlement. 31 U.S.C. § 3730(d)(1). If the government declines to intervene in the action, the relator is entitled to twenty-five to thirty percent of the proceeds of the action or settlement. 31 U.S.C. § 3730(d)(2).

The government may also pursue an alternate remedy for recovering funds fraudulently obtained:

> Notwithstanding subsection (b), *the Government may elect to pursue its claim through any alternate remedy available* to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.

31 U.S.C. § 3730(c)(5) (emphasis added).

Thus, if the government chooses to pursue an "alternate remedy," the relator is entitled to fifteen to twenty-five percent of the recovered proceeds. Relators argue that a criminal proceeding is such an "alternate remedy," and that they are therefore entitled to intervene to protect their interest in the proceeds.

As an initial matter, it is an open question as to whether a criminal proceeding constitutes an "alternate remedy" under the False Claims Act.[2] However, we need not reach the question in this case as to whether a criminal case constitutes an "alternate remedy," because the sole issue before us is

---

[2] Neither the plain words of the statute nor the legislative history is conclusive. The Senate Report for the False Claims Amendments Act of 1986 suggests that only civil and administrative remedies would be subject to the "alternate remedy" provision. S. Rep. 99-345, 99th Cong., 2d. Sess. 27, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5292. The House Report references criminal prosecutions. H. Rep. 660, 99th Cong., 2d Sess. 23 (1986). The Senate Bill was ultimately enacted, not the House version.

whether Relators are entitled to intervene in the criminal proceeding. There is nothing in the False Claims Act that affords Relators the right to intervene in a criminal prosecution. The sole remedy afforded relators under the False Claims Act is to commence "a civil action." 31 U.S.C. § 3730(b)(1).

The conclusion of the criminal forfeiture action does not preclude Relators from going forward with their qui tam action and receiving a portion of the proceeds. *See, e.g.*, *United States v. Lippert*, 148 F.3d 974, 975–76 (8th Cir. 1998) (permitting civil damages after defendant previously paid a criminal fine); *United States v. Eghbal*, 475 F. Supp. 2d 1008, 1016–19 (C.D. Cal. 2007) (awarding civil damages and penalties under the False Claims Act after defendant had paid criminal restitution).

Relators argue that Van Dyck may be judgment proof by that time. That may well be a practical concern, but it does not provide Relators with the right to intervene in a criminal action. Rather, they must establish their right to the proceeds through an authorized legal proceeding. The question of collection on a judgment is separate from an intervention right.[3]

---

[3] As the government points out, that issue is beyond the scope of this appeal, and there is nothing that necessarily prohibits Relators from asserting in their qui tam action that they are entitled to a portion of the forfeited funds to the extent that Van Dyck is entitled to a damage credit in that action.

## B

Relators also argue that they have standing to intervene in the criminal forfeiture action as "partial assignees of the government's claims" under 21 U.S.C. § 853(n). However, as we have previously discussed, they do not qualify under the statute. To expand the analysis: Section 853 allows a person to claim an interest in property forfeited if she can demonstrate by a preponderance of the evidence that:

> (A) the petitioner has a legal right, title, or interest in the property, . . . [which] renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property . . . .

21 U.S.C. § 853(n)(6).

Here, Relators are not alleging that they are bona fide purchasers for value. Thus, the only question is whether they have a legal right, title, or interest, established at the time Van Dyck committed his crimes, in Van Dyck's forfeited funds. They do not. Any right they have can only be established upon completion of the qui tam suit, which remains pending. And, as the district court determined, they did not tender sufficient evidence in this case to establish their right to a

portion of the proceeds. Therefore, Relators cannot intervene in the criminal forfeiture action under 21 U.S.C. § 853(n).

IV

The district court did not err in denying Relators' request for an evidentiary hearing to determine their rights in the proceedings, a request which was made orally for the first time at the hearing on Relators' motion to intervene. As we have discussed, Relators' sole statutory remedy is to commence "a civil action." 31 U.S.C. § 3730(b)(1). It is not through a criminal evidentiary hearing. Thus, the district court did not abuse its discretion in concluding that Relators' moving papers were not "sufficiently definite, specific, *detailed*, and *nonconjectural* to enable the court to conclude that contested issues of fact going to the validity of [a constitutional or statutory right] are in issue." (quoting *United States v. Walczak*, 783 F.3d 852, 857 (9th Cir. 1986)) (emphasis and alteration in district court order).

Nor did the district court abuse its discretion when it declined to consider Relators' request for the court to impose sanctions on the government. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

V

The district court correctly denied the Relators' motion to intervene in the criminal forfeiture proceeding. Their proper remedy is through their False Claims Act civil action. The

district court did not abuse its discretion in denying an evidentiary hearing or in declining to impose sanctions on the government.

**AFFIRMED.**